## DECLARATION OF PATRICK PAIGE

I, PATRICK PAIGE, DO HEREBY DECLARE:

1. I am over the age of eighteen (18) and otherwise competent to make this declaration. The facts stated in this declaration are based upon my personal knowledge.

2. I was a police officer from 1989 until 2011 for the Palm Beach County Sherriff's Department. From 2000-2011, I was a detective in the computer crimes unit.

3. As a detective in the computer crimes unit, I investigated internet child pornography and computer crime cases.

4. I have conducted forensic computer examinations for:

    (a) Broward County Sheriff's Office (BSO);

    (b) Federal Bureau of Investigation (FBI);

    (c) U.S. Customs and Border Protection (CBP);

    (d) Florida Department of Law Enforcement (FDLE);

    (e) U.S. Secret Service;

    (f) Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); and

    (g) Various municipalities in the jurisdiction of Palm Beach County.

5. I was assigned to a police unit working in conjunction with TLO Corp., which is a private company.

6. When I worked with TLO Corp., I supervised the other detectives assigned to the unit, which consisted of six online investigators and two computer forensic examiners.

7. With regard to my experience investigating child pornography cases, I supervised police officers whose responsibility it was to establish a successful TCP/IP connection with

persons who were sending pornographic images of children or other illegal content over the Internet using peer-to-peer file sharing programs.

8. I am familiar with software programs used to investigate computers, including EnCase and Access Data.

9. I have taken over 400 hours of courses designed to teach people how to investigate computers.

10. Also, while working from 2003-2011 for Guidance Software, the makers of EnCase, I have taught over 375 hours of courses in computer forensics ranging from beginner to advanced levels.

11. I have had students in my courses from various government branches, including: (a) sheriff's offices; (b) FBI agents; (c) ATF agents; (d) agents from the Central Intelligence Agency, and (e) individuals from other branches of government and the private sector.

12. After leaving the Palm Beach County Sherriff's office, I founded Computer Forensics, LLC, where I am currently employed.

13. I have received the following awards and commendations:

    (a)    1991 – Deputy of the Year, awarded by the 100 Men's Club of Boca Raton & Rotary Club.

    (b)    1997 – Deputy of the Month for June.

    (c)    2001 – Detective of the Month for October.

    (d)    2002 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jerrold Levy* case.

    (e)    2003 – U.S. Customs Service Unit Commendation Citation Award for computer forensic work in Operation Hamlet. Operation Hamlet was one of the largest rings in the history of U.S. Customs of individuals who were molesting their own children, and transmitting the images and video via the Internet.

    (f)    2005 – Detective of the Month for December.

    (g)    2007 – Outstanding Law Enforcement Officer of the Year, awarded by the United States Justice Department for work in the *U.S. vs. Jimmy Oliver* case.

    (h)    2008 – Letter of Commendation issued by the FBI for outstanding computer forensic work in the *U.S. vs. Frank Grasso* case.

14. I have testified as a fact and expert witness on numerous occasions in the field of computer forensics in both trial-level and appellate proceedings before state, federal, and military courts in Florida, California, New Jersey, New York, and Pennsylvania.

15. No court has ever refused to accept my testimony on the basis that I was not an expert in computer forensics. My skill set and my reputation are my most important assets in my current position with Computer Forensics, LLC.

16. The offenders' IP addresses, as well as the dates and times of the illegal transmission were recorded.

17. An officer would then request that the assistant state attorney subpoena the corresponding ISPs for the purpose of identifying the subscribers that were transmitting the illegal content.

18. In these cases, the subscribers were not notified by the ISPs that their identity was being subpoenaed because they could have deleted the images and destroyed the data.

19. After receiving the subscribers' identities, we would prepare a search warrant that would authorize us to enter the subscribers' dwelling and seize all of their computer devices.

20. I was directly involved in approximately 200 search warrants either by way of managing the process or performing it personally.

21. I can recall only one instance in all the times that we executed a search warrant and seized computers where we did not find the illegal content at the dwelling identified in the search warrant.

22. In that one instance, the Wi-Fi connection was not password protected, and the offender was a neighbor behind the residence.

23. I never came across a Wi-Fi hacker situation.

24. In my opinion, a child pornographer has a greater incentive to hack someone's Wi-Fi connection than a BitTorrent user because transmission of child pornography is a very serious crime with heavy criminal penalties, and many offenders can face life sentences if convicted.

25. I tested IPP International U.G.'s ("IPP") IP detection process.

26. To do so, I downloaded four public domain movies from the national archive.

27. I then encoded text into the videos, so that I would know whether someone that downloaded that particular movie downloaded the version of the movie that I created.

28. I then rented four virtual servers, each of which was connected to the Internet and used a unique IP addresses.

29. I then configured the servers so that all of them were running Windows 2008 server edition, and I put a different BitTorrent client onto each server.

30. A BitTorrent "client" is software that enables the BitTorrent protocol to work.

31. After installing the BitTorrent clients, I also installed Wireshark onto each server. "Wireshark" is a program that captures network traffic and creates PCAPs, just as TCP Dump, which IPP uses, does. A PCAP is like a video recording of all the incoming and outgoing transactions of a computer.

32. After installing Wireshark onto each of the servers, I transferred the movies from my local computer to the servers.

33. I then used the BitTorrent clients on each of the servers to make .torrent files. I uploaded these .torrent files onto various torrent websites.

34. I then informed IPP of the movie names. Thereafter, IPP sent me screen captures of the movies I had seeded.

35. The screen captures sent by IPP had my codes on them; thus, I knew that IPP had caught the movies I had seeded.

36. IPP also sent me additional data identifying the IP Address used by each of the four servers, and sent me PCAPs.

37. I reviewed IPP's PCAPs vis-à-vis the PCAP log files created by each of my test servers, and determined that IPP's PCAPs match my PCAPs. This could not have happened unless IPP's server was connected to the test server because the transactions would not match.

38. From this test, I concluded that IPP's software worked, and had a subpoena been issued for my IP addresses, it would have revealed my identity.

39. I also examined an image of the hard drive of the computer IPP had previously detected as using IP address 50.134.252.137.

40. I examined the hard drive image for evidence of: (a) use of the BitTorrent protocol and, more specifically, (b) evidence of infringement of copyrighted "X-Art" works owned by Plaintiff, Malibu Media, LLC ("Malibu Media") using BitTorrent.

41. I searched the hard drive image using the forensic software EnCase Version 6 & 7 by Guidance Software and Internet Evidence Finder 6.4.2.0070 by Magnet Forensics. The results

of my search and examination of the hard drive image are set forth in the Report of Findings ("Paige Report") attached hereto as Exhibit "A."

42. My search first revealed extensive use of BitTorrent. The search located evidence of hundreds of uTorrent log files demonstrating use of uTorrent, a BitTorrent client. Paige Report, Exhibit A, at p. 7.

43. The search further detected the existence of access of one hundred and eighty-four (184) uniform resource locators (URLs) or "web addresses" for torrent sites, including those of "Piratebay" and "btjunkie." *Id.* at p. 3 and Exhibit B ("Torrent URLs").

44. My search next revealed extensive evidence of infringement of Malibu Media's X-Art copyrighted works. First, an examination of the Firefox form history for the keyword "x-art" revealed several hits. Notably, the history is dated between July 2013 and October 2013. *Id.* at p. 4 and Exhibit C ("Firefox Form History").

45. I was also able to locate additional Internet history for "x-art" on various occasions between March 2014 and June 2014. *Id.* at p. 5 and Exhibit D ("Firefox Web History").

46. Second, my search of the hard drive image detected:

    a. two (2) media video fragment files of Malibu Media's copyrighted X-Art works (*id.* at p. 3 and Exhibit F ("Web Video Fragments"));

    b. eight hundred and seventy (870) BitTorrent file fragments, of which nineteen (19) were related to Malibu Media's copyrighted X-Art works (*id.* at p. 5); and

    c. thirty-six (36) bencode files relating to Malibu Media or X-Art torrent files (*id.* at p. 6).

47. "Bencode" files are encoding files commonly used by torrent files.

48. All of the foregoing evidence was detected in the hard drive's unallocated space.

49. Unallocated space is defined as the space on the hard drive of the computer that is available to write data to. The unallocated space is not viewable to the typical computer user and requires specialized computer forensic software to view and analyze. Unallocated space can contain deleted files or partially deleted files. When a file is deleted, the pointers to the file are removed, but the data remains in unallocated space until such time as the operating system stores another file in the same space, thereby over-writing the data.

50. Malibu Media further provided me with a list of files which included numerous third party works that IPP detected were distributed through BitTorrent by the computer using IP address 50.134.252.137. *See* Additional Evidence, attached hereto as Exhibit "H." This evidence indicates that the subject computer engaged in BitTorrent transactions associated with over 600 third party files between December 2012 and December 2013. *See* Additional Evidence, Exhibit H. These dates overlap with the period of infringement of Malibu Media's copyrighted works in this case.

51. In order to further correlate the subject hard drive to the BitTorrent activity detected by IPP in this case, I conducted a search to determine whether evidence of these third party files existed on the hard drive image. The search results were positive, i.e., they revealed that numerous files on the hard drive image were identical to the third party files on IPP's list. *See* Keyword Search for Reference File Titles, attached hereto as Exhibit "G."

52. I further detected evidence on the hard drive demonstrating that the hard drive utilized cloud storage and external storage devices, the contents of which have not been produced to me for examination. Specifically, the hard drive image showed evidence of the computer's access of Google Drive, Dropbox and a Seagate external hard drive. *See* Paige Report, Exhibit A, at pp. 2 and 8.

53. I am paid on an hourly basis by Malibu Media, LLC, at the rate of $325.00 per hour for pre-trial investigative work, although the fee increases if I am required to testify at trial.

**FURTHER DECLARANT SAYETH NAUGHT.**

**DECLARATION**

**PURSUANT TO 28 U.S.C. § 1746**, I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on this 3rd day of November, 2014.

By: *Patrick Paige*
(Digitally signed by Patrick Paige
DN: cn=Patrick Paige, o=Computer Forensics LLC, ou, email=patrick@patrickpaige.com, c=US
Date: 2014.11.03 11:54:23 -05'00')
**PATRICK PAIGE**